**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

L.W., an individual;

               Plaintiff

      -against-

HILTON WORLDWIDE HOLDINGS, INC.;

and HILTON MANAGEMENT, LLC;

           Defendants.

CIVIL ACTION NO:


**ORIGINAL COMPLAINT**
**JURY TRIAL DEMANDED**

## ORIGINAL COMPLAINT

COMES NOW the Plaintiff L.W., by and through the undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

## INTRODUCTION

1. For years, sex trafficking ventures have brazenly operated in and out of hotels throughout this country. Criminals parade their misconduct openly on hotel properties throughout the United States while the hotels and hospitality industry remain willfully blind to the criminal misconduct to continue earning a profit at the expense of human life, human rights, and human dignity.

2. Hilton Worldwide Holdings, Inc., and its management company, Hilton Management LLC, (collectively "Hilton") know and have known for more than a decade that sex trafficking repeatedly occurs under the Hilton flag throughout the country. Rather than taking timely and effective measures to thwart this epidemic, Hilton has instead chosen to ignore the open and obvious presence of sex trafficking on its properties, enjoying the profit from rooms rented for this explicit and apparent purpose.

3. This action for damages is brought by the Plaintiff, a survivor of sex trafficking, hereinafter

1

identified by her initials L.W., under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA").

4.  L.W. was 23 years old when she met her trafficker on Facebook. After talking online for several months, the trafficker convinced her to meet him in person. Soon thereafter, the trafficker began to verbally and physically abuse L.W., using threats and violence to force her to have sex with other men for money. L.W.'s trafficker posted photos of her on Craigslist and forced her to perform commercial sex every day, servicing 7-15 people daily—mainly at the Hilton Houston Galleria Area Hotel. Despite clear signs that L.W. was a victim of sex trafficking, Hilton stood by idly and profited from L.W.'s physical and psychological torment.

5.  The Plaintiff now brings this action for damages against the Defendants listed herein.  Each of the Defendants, in  violation of  18 U.S.C. § 1595, knowingly benefited from facilitating a venture that they knew, or at the very least should have known, to be engaging in sex trafficking in violation of 18 U.S.C. § 1591(a).

6.  L.W. was advertised on Craigslist, physically tortured, and then sexually exploited under duress at hotels in Houston, Texas including the Hilton Houston Galleria Area Hotel.

7.  As a direct and proximate result of Hilton's consistent refusals to prevent human trafficking on its hotel properties, L.W. was sex trafficked, sexually exploited, and victimized repeatedly at Hilton brand hotels.

8.  The Plaintiff brings this action pursuant to the Trafficking Victims Protection Reauthorization Act 18 U.S.C. §1595, against the Defendants who enabled, harbored, held, facilitated, and financially benefited from a sex trafficking venture in which L.W. was trafficked for the purpose of commercial sex, sexually exploited, and brutally victimized in violation of 18 U.S.C. §1591(a).

## PARTIES

9.   The Plaintiff, having moved to proceed anonymously,[1] and herein identified by her initials L.W., was 23 years old when she was first trafficked in Texas for the purposes of commercial sex. The Plaintiff is a victim of trafficking pursuant to 22 U.S.C. §7102 (15) and 18 U.S.C. §1591(a), and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C §7102 (11).   The Plaintiff currently resides in Conroe, Texas.

10.   Defendant Hilton Worldwide Holdings, Inc. is one of the largest hotel brands in the world.  It is a foreign corporation organized and existing under the laws of Delaware, whose principal office is located at 7930 Jones Branch Drive, Suite 1100, McLean, Virginia 22102. Defendant may be served with process by serving the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701 as its agent for service because Defendant engages in business in Texas but does not maintain a regular place of business in Texas or a designated agent for service of process.  This suit arose from Defendant's business in this state. Tex. Civ. Prac. & Rem. Code §§ 17.044(b), 17.045.

11. Defendant Hilton Management LLC is Hilton's management company. Defendant Hilton Management LLC is a foreign corporation organized and existing under the laws of Delaware, whose principal office is located at 9336 Civic Center Drive, Beverley Hills, California 90210. Defendant is authorized to do business in Texas and may be served with process by serving its registered agent for service of process, CSC – Lawyers Incorporating Service Company, in Travis County at 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.

12. Hilton Houston Galleria Area Hotel is a Hilton brand property. As a hotel operator, Hilton

---

[1] Contemporaneously with the Complaint, Plaintiff L.W. filed a Motion for Protective Order and Leave to Proceed Anonymously with Memorandum in Support based upon the nature of the allegations in the instant Complaint, which are of an inherently intimate and personal nature. That motion is pending. Undersigned Counsel will provide her identity to counsel for the Defendants upon proper effectuation of service.

controls the training and policies for its branded properties, including the Hilton Houston Galleria Area Hotel where L.W. was trafficked. Hilton represents that it considers guest safety and security important and expects the hotels in its portfolio to comply with Hilton's brand standards and all local, state, and federal laws.

13. Through its relationship with the staff at the Hilton Houston Galleria Area Hotel and the perpetrator who trafficked L.W. there, Hilton knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had engaged in sex trafficking.

14. Hilton receives a percentage of the gross room revenue from the money generated by the operations of its hotels, including a percentage of the revenue generated for the rate charged on the hotel guest rooms in which the Plaintiff was sex trafficked.

15. Whenever reference is made in this Complaint to any act, deed or conduct of the defendants, the allegation is that the Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendants.

## JURISDICTION AND VENUE

16. This Honorable Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 because this action arises under the Constitution, laws, or treaties of the United States (with an amount in controversy that exceeds $75,000.)

17. Venue is proper in this district pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the Defendants' misconduct and omissions, occurred in the judicial district where this action is

4

brought.

## SEX TRAFFICKING UNDER FEDERAL LAW

18.  Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion."  This definition combines the three elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

19.  To best understand the mechanism by which sex trafficking ventures are prohibited by federal criminal law, it's best to address these elements in the reverse.  Sex trafficking is slavery for the *purpose* of commercial sex and prohibited by 18 U.S.C. § 1589 and §1590.  The crime of slavery can then be divided into the two (2) elements remaining: the act and the means.  The *act* is the "harboring, transporting, providing, or obtaining," of forced labor, codified as a violation of 18 U.S.C. §1590, while the *means* is labor "obtained or provided by force, fraud or coercion" and is codified as a violation of 18 U.S.C. §1589.

20.  Thus, while the complete definition of 'sex trafficking' is found in the TVPRA under 22 U.S.C. § 7102, and it is specifically prohibited under 18 U.S.C. §1591, it is nevertheless a long-recognized and familiar atrocity.

21.  Pursuant to 18 U.S.C. §1591(a), all who knowingly provide *or* obtain commercial sex through force, fraud, or coercion are guilty of sex trafficking.  This includes ***both*** the 'traffickers' who recruit, harbor, transport, and provide individuals for forced commercial sex ***and*** the 'Johns' or 'buyers' who obtain, solicit, or patronize forced commercial sex.[2]

---

[2] While the 'pimps' or 'providers' are often referred to as the 'traffickers' and the purchasers are referenced as the 'Johns', 'tricks', or 'buyers' [and such nomenclature is used herein], under federal law ***both*** categories are 'traffickers'.

## FACTUAL ALLEGATIONS

### A. THE HOSPITALITY INDUSTRY'S PARTICIPATION IN THE SEX TRAFFICKING INDUSTRY

*"75% of survivors responding to Polaris's survey reported coming into contact with hotels at some point during their exploitation…Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff."*

*-The Polaris Project [3]*

22. Human trafficking is the world's fastest growing crime.[4]  While the term 'human trafficking' incorporates all forced labor, the sex trafficking industry alone pulls in an estimated $99 billion each year making it the second largest illicit crime industry behind only the sale of *all* illegal drugs.[5]

23. Sex traffickers, or 'pimps', use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

24. The hospitality industry plays a crucial role in the sex trade.[6]  The trope of the "no-tell motel" is certainly not a new one.  Hotels have long profited from their reputations as havens of privacy and discretion for the offending.  Hotels offer anonymity and non-traceability, making them ideal venues for crime and sex trafficking in particular.

25. According to National Human Trafficking Hotline statistics, hotels are the top-reported venue, even over commercial front brothels, where sex trafficking acts occur.[7]  Traffickers and

---

[3] *Recommendations for Hotels and Motels*, THE POLARIS PROJECT, https://polarisproject.org/hotels-motels-recommendations (last visited June 19, 2019).

[4] *Human Trafficking is the World's Fastest Growing Crime*, THE ADVISORY BOARD (May 22, 2017, 9:30 AM), https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking.

[5] *Profits and Poverty: The Economics of Forced Labor*, INTERNATIONAL LABOR ORGANIZATION (May 24, 2014), http://www.ilo.org/global/publications/ilo-bookstore/order-online/books/WCMS_243391/lang--en/index.htm.

[6] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[7] *National Human Trafficking Hotline Statistics*, THE POLARIS PROJECT (2016), https://polarisproject.org/resources/2016-hotline

buyers alike frequently use hotel rooms to exploit victims.

26.   Traffickers use hotels as the hub of their operations. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex. This is referred to as an 'in call'.

27.   Hotels are also the venue of choice for buyers seeking an 'out call,' wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction.   Unsurprisingly, those on the demand side of this transaction (i.e. those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels.   In New York City alone, 45% of all reported sexual exploitation took place in hotels, including the Ritz Carlton and the Plaza.[8]

28.   The problem is industry wide.   In the United States, as much as 63% of all trafficking incidents happen in hotels ranging from luxury to economy.[9]

29.    Due to the overall complacency of the hospitality industry on addressing the issue, hotels are *the* venue of choice for sex trafficking.[10]   Traffickers and buyers capitalize on the hotel industry's general refusal to adopt and enforce companywide anti-trafficking policies from the corporate to the property level, train staff on what to look for and how to respond, and/or establish safe and secure reporting mechanisms for those at the point of sale.

30.   Every day, thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation.   Thus, the hospitality industry has the greatest reach to prevent, identify and thwart sexual exploitation where it is most likely to occur.

---

statistics.

[8] Giovanna L. C. Cavagnaro, *Sex Trafficking: The hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[9] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).

[10] *Hotels Initiative*, THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited June 19, 2019).

31.   But aside from their unique position in this epidemic, hotels and motels have the highest obligation to protect their guests from known dangers, including sex trafficking and sexual exploitation, and should be held accountable when they fail to comply.  As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."[11]

32.   Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a critical and obvious legal obligation for the hospitality industry.  The presence of sex trafficking and sexual exploitation in a hotel is frequently an obvious occurrence and, although unutilized, underutilized, or ineffectively utilized, numerous well-researched trainings and toolkits have been published to the hotel industry over the last decade to help hotel staff in every position to identify the signs.[12]

33.   From check-in to check-out there are a number of indicators that traffickers and their victims exhibit during their stay at a hotel.  With proper training and the implementation of reasonable security measures, hospitality companies could prevent regular sex trafficking under their flag.

34.   Obvious signs of sex trafficking at a hotel may include: an excess of condoms in rooms, individuals carrying or flashing large amounts of cash, excessive amounts of cash stored in the room, renting two (2) rooms next door to each other, declining room service for several consecutive days, significant foot traffic in and out of room(s), men traveling with multiple women who appear unrelated, women known to be staying in rooms without leaving, women

---

[11] Giavanna L. C. Cavagnaro, *Sex trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[12] DEPARTMENT OF HOMELAND SECURITY, *Blue Campaign Toolkit*, attached as "Exhibit A." Available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

displaying physical injuries or signs of fear and anxiety, guests checking in with little or no luggage, hotel guests who prevent another individual from speaking for themselves, or a guest controlling another's identification documents.[13]

35. Obviously, hotel staff who have undergone training are more aware of sex trafficking when it happens and are more willing to report it than hotel staff who have not been trained.[14] Thus, hospitality companies are obligated to adopt policies and procedures related to sex trafficking and to enforce these policies and procedures as brand standard through to the property level.

36. Hospitality companies can and should mandate that *all* staff working at *all* hotel properties across their brand complete sex trafficking training.[15]

37. The hospitality industry has been cognizant of their role and responsibilities in the sex trafficking industry for years.

38. Nationwide campaigns recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue, and took initiative as early as 1997 with the United Nations Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[16] These efforts sought to educate both the public and private sectors, including the hospitality industry, on identifying and combatting human trafficking, and both campaigns released online resources and toolkits publicly accessible to any

---

[13] Id. See also, Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

[14] Giavanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[15] Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, The Institute to Address Criminal Sexual Exploitation, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

[16] *DHS Blue Campaign Five Year Milestone*, DEPARTMENT OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

entity concerned with human trafficking.[17]

39. Hospitality companies have both the power and responsibility to make sex trafficking difficult for the offenders. Yet, they either repeatedly fail to heed the call or repeatedly failed to execute their own policies. Instead, each continues to facilitate these crimes at their hotels, content to direct their efforts solely to profit and the bottom line.

## B. THE HOTEL BRANDS' CONTROL THE HOSPITALITY INDUSTRY

40. Hotel brands or flags lend their name and likeness to third-party owners, while the building and operations are run by a franchisee or a third-party management company under the brands' control. In return, the parent brand exchanges the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning a franchise contract and still profits from putting heads in beds.

41. The average consumer does not see this relationship. The parent brand gives the franchisee property its identity. It provides signage on and in front of the building that assures customers that if they check into that hotel, they can expect standards consistent with the parent hotel brand. The same brand is emblazoned on everything in the hotel from the pens in the bedside tables to the staff uniforms at the front desk.

42. The parent brand also provides the franchise hotel with access to its brand wide central reservation system, 800 number, revenue management tools, world-class loyalty programs and a website. Thus, booking and room reservations are controlled by the corporate parent brand.[18]

43. The franchise hotel typically pays around 10% of their total revenue back to the parent hotel brand and is required to develop and maintain the property in accordance with the parent

---

[17] *Human Trafficking and the Hospitality Industry*, DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited June 19, 2019).

[18] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (April 10, 2018) https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/.

brand's standards as they are laid out in the franchise agreement.

44. Per the franchise agreement, the parent brand may enforce these standards through periodic inspections and even termination of the franchise agreement if the franchise hotel is found to be inadequate. The right of the parent brand to enforce their brand standards is also their responsibility.

45. At the time of the incidents alleged herein, Defendant Hilton Worldwide Holdings. Inc owned and controlled the Hilton brand, while Defendant Hilton Management LLC managed many of the Hilton properties.

46. Parent hotel brands may kick delinquent hotels out of their system, but it is at the expense of terminating their royalty payments.

## C. THE DEFENDANTS' WILLFUL BLINDNESS TO SEX TRAFFICKING AT THEIR HOTELS

47. Defendant Hilton Worldwide Holdings, Inc. and its management company, Defendant Hilton Management LLC (collectively "Hilton") have been on notice of repeated incidences of sex trafficking occurring at their brand hotels; yet, these brand managers failed to take the necessary action to prevent sex trafficking and still persist in failing to take the necessary action to prevent sex trafficking at their hotels.

48. The Hilton Houston Galleria Area Hotel located at 6780 Southwest Freeway, Houston, Texas 77074 at all material times herein was owned and operated in accordance with a franchise agreement with Hilton. Hilton failed to promulgate or enforce any policies to protect Plaintiff L.W. from being sex trafficked.

49. Hilton knew or should have known that the Hilton Houston Galleria Area Hotel where Plaintiff L.W. was trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff L.W. was

11

trafficked.[19]

50. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Hilton has repeatedly failed to stop these actions.

51. Hilton could have exercised control over its hotels, including the Hilton Houston Galleria Area Hotel, by:

 a. distributing information to assist employees in identifying human trafficking;

 b. providing a process for escalating human trafficking concerns within the organization;

 c. requiring employees to attend training related to human trafficking;

 d. providing new hire orientation on human rights and corporate responsibility;

 e. providing training and education to Hilton branded hotels through webinars, seminars, conferences, or online portals;

 f. developing and holding ongoing training sessions on human trafficking; or

 g. providing checklists, escalation protocols or other information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

52. Hilton was in an agency relationship with Hilton branded hotels, including the Hilton Houston Galleria Area Hotel. This agency relationship was created through Hilton's exercise of an ongoing right of control over the hotels through one or more of the following actions:

 a. hosting online bookings on Hilton's domain;

 b. requiring Hilton branded hotels to use Hilton's customer rewards program;

---

[19] *Houston Crime Rates*, NEIGHBORHOOD SCOUT, https://www.neighborhoodscout.com/search/location/2319863#crime (last visited Oct. 18, 2019) (in the area where the Hilton Houston Galleria Hotel is located, residents have one of the highest chances of becoming a victim of violent crime of any neighborhood in the state).

c. setting employee wages;

d. making employment decisions;

e. advertising for employment;

f. sharing profits;

g. standardized training methods for employees;

h. building and maintaining the facility in a specified manner;

i. standardized or strict rules of operation;

j. regular inspection of the facility and operation;

k. fixing prices; or

l. other actions that deprive Hilton branded hotels of independence in their business operations.

53. An apparent agency also exists between Hilton and Hilton branded hotels, including Hilton Houston Galleria Area Hotel. Hilton held out its branded hotels to the public as possessing authority to act on its behalf.

54. Given Hilton's public statements on behalf of its hotel brands, and the control it exercised in educating and directing its branded hotels, including the Hilton Houston Galleria Area Hotel, Hilton breached its duties in the following ways:

a. did not adequately distribute information to assist employees in identifying human trafficking;

b. failed to provide a process for escalating human trafficking concerns within the organization;

c. failed to mandate managers, employees, or owners attend training related to human trafficking;

   d.  failed to provide new hire orientation on human rights and corporate responsibility;

   e.  failed to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

   f.  failed to develop and hold or require ongoing training sessions on human trafficking; or

   g.  failed to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

55. For years, Hilton has demonstrated willful blindness to the rampant culture of sex trafficking which tragically occurs on its branded properties throughout the country. This same entrenched, pervasive willful blindness to sex trafficking facilitated the sex trafficking of Plaintiff L.W. at the Hilton Houston Galleria Area Hotel, which forms the basis of this complaint.

   a.  In June 2010, police discovered a brothel and underage prostitutes operating in a Hilton hotel in Chongqing, China.[20]

   b.  In 2014, a 25-year-old woman was killed at a DoubleTree by Hilton hotel in Portland Oregon while being trafficked.[21]

   c.  In January of 2016, a Colorado grand jury indicted seven people who were accused of running a child sex trafficking ring in Denver, Colorado. Members rented rooms at various hotels including a Doubletree by Hilton, then forced the

---

[20] David Nersessian, *Hilton: Combating Human Trafficking in the Hospitality Industry*, Babson College (2018), https://store.hbr.org/product/hilton-combating-human-trafficking-in-the-hospitality-industry/BAB434.

[21] *Family sues Backpage.com, Oregon hotel after sex trafficking victim's death*, 13KVAL Eugene Oregon (Dec. 27, 2017), https://kval.com/news/local/family-sues-backpagecom-oregon-hotel-after-sex-trafficking-victims-death.

victims to engage in commercial sex acts while pocketing the victims' earnings.[22]

d.  In January 2016, a man was sentenced to ten years in prison after sex trafficking young women. One girl was forced to service men out of a Hampton Inn by Hilton in Braintree, Massachusetts.[23]

e.  In 2016, the Hilton Houston Galleria Area Hotel scheduled the TEXXXAS pornography expo to take place at the hotel in August. The expo was cancelled in July only after it received pressure from the National Center on Sexual Exploitation, which expressed its concerns that the convention would bring an increased demand for prostitution and sex trafficking.[24]

f.  In January 2017, two women were forced into prostitution in West Melbourne, Florida at a Hampton Inn by Hilton.[25]

g.  In September 2017, a grand jury indicted two men who had lured a woman from California to Philadelphia, where she was forced into prostitution. Using ads posted on Backpage.com, the trafficking occurred at the Hampton Inn by Hilton in Philadelphia, PA.[26]

h.  In April 2018, a school district superintendent paid two teenage girls he found on social media websites for sex. Police arrested this man in the parking lot of a Hampton Inn by Hilton in Richland, Washington, and he was charged with

---

[22] *Seven indicted by Colorado grand jury in child sex trafficking ring bust*, Fox 31 Denver (Jan. 6, 2016), https://kdvr.com/2016/01/06/7-indicted-by-colorado-grand-jury-in-child-sex-trafficking-ring-bust/.

[23] *Local motels, hotels are hotbeds for sex trafficking*, The Enterprise (Jan. 29, 2016), https://www.enterprisenews.com/news/20160129/local-motels-hotels-are-hotbeds-for-sex-trafficking.

[24] *Upcoming Houston adult expo booted from hotel venue after advocacy group pressure,* HoustonChronicle.com (Jul. 22, 2016), https://www.chron.com/news/houston-texas/houston/article/Upcoming-Houston-porn-convention-booted-from-its-8403385.php.

[25] *Sex trafficking arrest made in Brevard County*, WESH 2 (Jan. 3, 2017), https://www.wesh.com/article/sex-trafficking-arrest-made-in-brevard-county/8559155#.

[26] *Feds indict 2 in sex trafficking case*, Daily Local News (May 27, 2018), https://www.dailylocal.com/news/feds-indict-in-sex-trafficking-case/article_652194f5-807b-57ce-8cb4-91a3ada32291.html.

attempted child sex trafficking.[27]

    i.   In April of 2018, eleven men from the Baltimore and Washington, D.C. area were arrested in a prostitution sting operation at a DoubleTree by Hilton in Colombia, MD.[28]

## D. THE SEX TRAFFICKING OF L.W.

56.   In the fall of 2012, 23-year-old L.W. met her trafficker on Facebook. After talking online for 5-6 months, the trafficker told her she could make some extra money taking older men out on dates—dates with *no* sex. L.W. was apprehensive at first, but she eventually planned to meet the trafficker in person and go on one of these dates.

57.   Shortly thereafter, the trafficker began verbally and physically abusing her, using threats and violence to force her to have sex with other men for money: $160 for 30 minutes of intercourse and double for an hour. Although L.W.'s trafficker provided her with food, clothing, make-up, marijuana, and liquor, he kept every dollar generated from the trafficking, claiming he was putting it aside for her to save up for a car and house.

58.   L.W.'s trafficker posted her photo on Craigslist to advertise her for commercial sex. L.W. was forced to work every day and serviced between 7-15 people daily so that her trafficker could make at least $1,000 per night. She was not permitted by her trafficker to refuse any man unless she suspected he was a police officer. L.W. could not bring herself to leave because of her trafficker's verbal and physical abuse.

59.   The majority of L.W.'s trafficking experience took place in the Hilton Houston Galleria Area Hotel shortly after she met her trafficker in the fall of 2012. L.W. was required to pay for

---

[27] *Ex-Kennewick superintended trying to avoid life behind bars in child sex case*, Tri-City Herald (April 10, 2018), https://www.tri-cityherald.com/news/local/crime/article208538224.html.

[28] *11 men arrested in prostitution sting at Columbia hotel*, Fox 45 News (April 6, 2018), https://foxbaltimore.com/news/local/11-men-arrested-in-prostitution-sting-at-columbia-hotel.

the hotel room in cash while her trafficker monitored her in the lobby approximately 50 feet away. After L.W. paid for the room and provided her ID, her trafficker would escort her to the room. Despite this highly suspicious behavior, at no time was L.W.'s trafficker stopped or questioned by the hotel's staff.

60.   On one occasion, L.W. was brought to the Hilton Houston Galleria Area Hotel by her trafficker, who told her to work because she was short on money. When L.W. protested, her trafficker began beating her in the hotel room while the door was open. After beating her to the ground, he dragged her by her hair into the bathroom, took her belongings, and left her there. When she came to, L.W. went downstairs, crying, and requested to use the front desk's phone to call her mother to come get her. When she asked the hotel staff if she could have her room deposit refunded, they asked her to leave the hotel. Thus, despite L.W.'s vulnerable position after being beaten by her trafficker, she was disregarded and mistreated by the hotel staff—a hotel that only cared about its profits, rather than a guest in crisis.

61.   Prior to, during, and following the incidents described herein, the Hilton had actual and/or constructive notice of trafficking, prostitution, and/or general safety concerns at their hotels, including, but not limited to, video surveillance of their hotels, as well as oral or written complaints regarding said suspicious activity. Hilton failed to take any actions to curtail these activities.

62.   Had Hilton been paying attention to the activities being conducted at their hotels and on their properties, and the apparent red flags outlined above, it would have been impossible for them not to notice the victimization of L.W.

### E.  THE DEFENDANTS FACILITATED THE TRAFFICKING OF L.W.

63.    Hilton profited from the sex trafficking of L.W. and knowingly or negligently aided and engaged with her trafficker in his sex trafficking venture. For months, Hilton repeatedly rented rooms to L.W. for cash while her trafficker stood 50 feet away and subsequently escorted her to the room. Hilton knew, or should have known, that the trafficker was using the hotel room to imprison L.W., physically assault her, and subject her to repeated exploitation as he forced her into sexual servitude.

64.  Hilton knew, or should have known, that L.W. was being trafficked and that Hilton was knowingly benefiting financially from the exploitation, because L.W.'s trafficker frequented Hilton's hotels, including the Hilton Houston Galleria Area Hotel.

65.  Hilton knew, or should have known, that L.W. was being trafficked because L.W. performed commercial sex there daily for approximately two months, servicing between 7-15 persons per day (resulting in frequent, unannounced male guests coming and going from one hotel room); L.W. paid cash and was monitored and escorted by her trafficker in the hotel's lobby; on one occasion, L.W. was brutally beaten while the hotel room door was wide open, and shortly therefore, was crying when she requested help from the front desk, only to be turned away by hotel staff. This behavior by L.W. and her trafficker indicated that he was using Hilton's hotel for an illegal sex trafficking venture.

66.  Hilton actively participated in this illegal endeavor by knowingly or negligently providing lodging to L.W.'s trafficker in which to harbor L.W. while he was trafficking her.

67.  Hilton profited from the sex trafficking of L.W. and knowingly or negligently aided and participated with L.W.'s trafficker in his criminal venture. Hilton took no action as L.W. repeatedly visited the hotel, often with different guests, without any luggage, and avoiding all

18

eye contact—all while being monitored and escorted by her trafficker.

68. Hilton actively participated in this illegal endeavor by knowingly or negligently providing lodging to those who purchased sex from L.W. in which to harbor L.W. while she was being trafficked.

69. Hilton had the opportunity to stop L.W.'s trafficker and offenders like him from victimizing L.W. and others like her. Instead, Hilton failed to take reasonable measures to stop sex trafficking from occurring in its hotels.

70. Hilton financially benefited from the sex trafficking of L.W., and other victims like her, and developed and maintained business models that attract and foster the commercial sex market for traffickers and buyers alike.

71. Hilton enjoys the steady stream of income that sex traffickers bring to their budget level hotel brands, such as Hampton Inn and Homewood Suites.

72. Hilton financially benefits from their ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

73. Hilton failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation on its properties.

74. Hilton maintained its deficiencies to maximize profits by:

    a. Reducing the cost of training employees and managers of how to spot the signs of human trafficking and sexual exploitation and what steps to take;

    b. Not refusing room rentals, or reporting guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

    c.   Lowering security costs by not having proper security measures, including, but not limited to, employing qualified security officers to actively combat human trafficking and sexual exploitation;

75. As a direct and proximate result of these egregious practices on the part of the Defendants, L.W. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

## CAUSES OF ACTION

### A. COUNT ONE – 18 U.S.C §1595 ("TVPRA")

76. The Plaintiff L.W. incorporates each foregoing allegation.

77. L.W. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

78. The Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, the Defendants had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to be violations of 18 U.S.C. §1591(a). At all relevant times, the Defendants breached this duty by participating in, and facilitating, the harboring and providing of L.W. for the purposes of commercial sex induced by force, fraud, and/or coercion.

79. The Defendants have financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade. Moreover, the Defendants directly benefitted from the trafficking of L.W. on each occasion they received payment for rooms that she was being kept in at the Defendants' hotels. The actions, omissions, and/or commissions alleged in this pleading were the proximate cause of L.W.'s injuries and damages.

80. L.W. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendants' hotels and properties in violation of 18 U.S.C. §1591(a).

## JURY DEMAND

81. Plaintiff asserts her rights under the Seventh Amendment to the U.S. Constitution and demands, in accordance with Federal Rule of Civil Procedure 38, a trial by jury on all issues.

## PRAYER FOR RELIEF

WHEREFORE the Plaintiff requests that the jury selected to hear this case render a verdict in her favor on all counts alleged, and against each and every named Defendant, separately and severally, and that it award the following damages to her:

a. Past and future medical expenses, as well as the costs associated with past and future life care;

b. Past lost wages and future loss of earning capacity;

c. Past and future mental anguish and emotional distress;

d. Consequential and/or special damages;

e. All available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

f. All other available compensatory damages for the described losses with respect to each cause of action;

g. Disgorgement of profits obtained through unjust enrichment;

h. Restitution;

i. Punitive damages with respect to each cause of action;

j. Reasonable and recoverable attorneys' fees;

k. Costs of this action; and

l. Pre-judgment and all other interest recoverable.

21

Also, on the basis of the foregoing, the Plaintiff requests that a jury be selected to hear this case and render a verdict for the Plaintiff, and against the Defendants, and that it award damages to the Plaintiff in an amount which adequately reflects the enormity of the Defendants' wrongs, and which will effectively prevent other similarly caused acts.  Further, the Plaintiff requests that the Court enter judgment consistent with the jury's verdict and prays for any other damages and equitable relief the Court or jury deems appropriate under the circumstances.

Dated:  October 24, 2019

RESPECTFULLY SUBMITTED,

BLIZZARD LAW, PLLC

 /s/   *Anna Greenberg*
Edward Blizzard (Fed. Bar #6325)
Anna Greenberg (Fed. Bar #3006378)
5020 Montrose Blvd., Suite 410
Houston, TX 77006
T:  (713) 844-3750
F:  (713) 844-3755
E:  Eblizzard@blizzardlaw.com
E:  Agreenberg@blizzardlaw.com
*Attorneys for Plaintiff*

22